## UNITED STATES, Appellee,

v.

## Michelle T. MARENGHI, Defendant— Appellant.

### No. 96–1268.

United States Court of Appeals, First Circuit.

Heard July 29, 1996.

Decided March 19, 1997.

---

Robert M. Napolitano, Portland, ME, for appellant.

Helene Kazanjian, Assistant United States Attorney, with whom Jay P. McCloskey, United States Attorney, was on brief, for appellee.

Before TORRUELLA, Chief Judge, and BOUDIN, Circuit Judge, and LISI,* District Judge.

LISI, District Judge.

Following a three-day trial, a jury convicted defendant-appellant Michelle T. Marenghi of conspiring to possess with intent to distribute a controlled substance containing cocaine base, as well as the underlying substantive offense, in violation of 21 U.S.C. §§ 846

* Of the District of Rhode Island, sitting by designation.

and 841(a)(1). The appellant was thereafter sentenced to a term of imprisonment of seventy months, to be followed by four years of supervised release. She appeals her conviction on the ground that the district court erred in denying a motion to suppress a written statement elicited from her shortly after her arrest. For the reasons set forth below, we affirm.

## I. BACKGROUND

In October 1994, agents from the Maine Drug Enforcement Agency ("MDEA") commenced an investigation into the distribution of crack cocaine in Portland, Maine. Specifically, the agents targeted a group of individuals who purchased the substance in Boston, Massachusetts, transported it to Portland, and thereafter sold it out of various hotel rooms and houses in the Portland area. The investigation continued for approximately two months, and was aided on several occasions by the cooperation of a number of "concerned citizens." [1]

The investigation culminated at approximately 11:00 p.m. on December 9, 1994, when agents from the MDEA and officers from the Portland Police Department pulled into a driveway in Portland behind a vehicle driven by the appellant and occupied by five others. All of the occupants, including the appellant, were removed from the vehicle and separately detained at the scene. The agents thereafter proceeded to search the vehicle in which the individuals were riding.

The appellant was handcuffed and placed in the back seat of an unmarked police car in which Portland Police Officer Robert Pelletier sat. Robert Pelletier's brother and brother officer, Scott Pelletier, a detective assigned to the MDEA, got into the car shortly thereafter. Scott Pelletier proceeded to explain to the appellant why the vehicle had been stopped and that she would soon be transported to a Portland police station. Scott Pelletier informed the appellant that a

drug-detecting dog had alerted to drugs on the bodies of two of the other individuals who had been riding in the appellant's vehicle, and that the dog would be used to search her as well. Scott Pelletier then exited the vehicle.

At that point, Robert Pelletier told the appellant that the dog could find drugs anywhere on a person, even if a person was carrying the drugs in a body cavity. The appellant responded, stating "I don't have it up there, I have it down here." Transcript, April 4, 1995 Hearing on Motion to Suppress, at 174. Robert Pelletier then got out of the automobile and told Scott Pelletier that the appellant wanted to speak with him. When Scott Pelletier returned to the vehicle, the appellant stated that the officers would not need to use the dog to search her and that she did indeed possess crack cocaine.

At several points during this exchange, the appellant indicated that she needed to use a bathroom. At no time was she advised of her *Miranda* rights, however. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Approximately ninety minutes after the appellant was first detained, Scott Pelletier transported her to the Portland Police Department.[2]

Upon arriving at the police station, the appellant again told Scott Pelletier that she needed to use the bathroom. Scott Pelletier advised her that a female officer would have to accompany her, but that none were present at the police station. Scott Pelletier placed the appellant in a room with Officer Bruce Chase, and left in an effort to locate a female officer.

Scott Pelletier returned ten minutes later. At that point, he advised the appellant of her *Miranda* rights, inquiring of the appellant after reading each right if she understood what it meant. The appellant indicated that she did.

---

1. A detailed account of the investigation can be found in the July 17, 1995 Memorandum and Order of the district court. *See United States v. Marenghi*, 896 F.Supp. 207, 209–13 (D.Me.1995).

2. The MDEA agents stopped the appellant's vehicle at approximately 11:00 p.m. Scott Pelletier

testified that he arrived at the scene between 11:40 p.m. and 11:50 p.m., and that he departed with the appellant for the police station approximately forty minutes later. *See* Transcript, April 4, 1995 Hearing on Motion to Suppress, at 44 & 111.

Scott Pelletier then left to inquire as to whether the efforts to locate a female officer had been successful. Upon learning that they had not, Scott Pelletier returned and asked the appellant whether she had inserted the drugs inside a body cavity or whether they were merely inside her clothing. The appellant stated that the narcotics were easily retrievable and, in the presence of Scott Pelletier and Officer Chase, proceeded to reach into her pants and remove a plastic bag, which she then placed on the floor. The appellant was thereafter permitted to use the bathroom without the accompaniment of a female officer.

The appellant was then moved to a station lunch room, where she proceeded to dictate a statement concerning her involvement in distributing crack cocaine in Portland. When complete, Scott Pelletier had the appellant read each page of the document for inaccuracies. After correcting one sentence, the appellant initialed the corner of each page, as well as the correction, and then signed the statement.

On December 20, 1994, a grand jury returned a two-count indictment charging the appellant with conspiracy to possess with intent to distribute more than five grams of cocaine base, as well as possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1). On February 9, 1995, the appellant filed a motion to suppress as evidence in her criminal trial "any and all statements and evidence ... obtained on the night of her arrest," including: (1) any statements that she made to the Pelletiers in the unmarked police cruiser (hereafter referred to as the "roadside statements"); and, (2) the written statement made at the Portland Police Station (hereafter referred to as the "written statement").

The district court conducted an evidentiary hearing on the suppression motion and issued a memorandum and order on July 17, 1995 granting the motion in part and denying it in part. The district court found that the roadside statements were made while the appellant was in custody and without benefit of *Miranda* warnings. *See United States v. Marenghi,* 896 F.Supp. at 215. The roadside statements were therefore excluded from use at trial. *See id.*

The district court then proceeded to make two findings with respect to the written statement. First, the court found that the appellant dictated the written statement after she had made a voluntary, knowing, and intelligent waiver of her *Miranda* rights. *See id.* at 217–19. Second, the court found that the circumstances surrounding the appellant's written confession were sufficiently attenuated from the constitutional infirmities which rendered the roadside statements inadmissible. *See id.* at 216. Thus, the district court permitted the government to introduce the written statement at trial.

The appellant challenges the district court's denial of her motion to suppress the written statement.

## II. DISCUSSION

At the outset, it is incumbent upon this court to delineate the correct standard of its review. In the context of a motion to suppress, we examine a district court's findings of fact for clear error. *See United States v. Mitchell,* 85 F.3d 800, 804 (1st Cir.1996); *United States v. Valle,* 72 F.3d 210, 214 (1st Cir.1995). In contrast, we conduct *de novo* inquiries into district court determinations with respect to questions of law, including those involving the Constitution. *See United States v. Valle,* 72 F.3d at 214; *United States v. Zapata,* 18 F.3d 971, 975 (1st Cir.1994).

In this case, the appellant challenges the validity of the district court's order with respect to the admissibility of the written statement. The suppression of the roadside statements is not at issue. Nevertheless, this court must examine the circumstances under which the roadside statements were made, as the admissibility of the written statement is, in part, dependent upon whether the police conduct at the roadside was coercive.

When law enforcement officials do not deliberately engage in coercive or improper tactics in obtaining an initial statement, but rather only fail to advise a defendant of his or her *Miranda* warnings, a court's task in

determining the admissibility of a subsequent statement is relatively straightforward. Such a statement is admissible if it was obtained after the defendant: (1) was advised of his or her *Miranda* rights; and, (2) knowingly and voluntarily waived those rights. *See Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1297–98, 84 L.Ed.2d 222 (1985); *Bryant v. Vose,* 785 F.2d 364, 366–67 (1st Cir.), *cert. denied,* 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986). This standard reflects the belief that "[w]hen neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Oregon v. Elstad,* 470 U.S. at 312, 105 S.Ct. at 1294–95. "In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke [his or her] rights." *Id.* at 314, 105 S.Ct. at 1296.

■ There is an enormous difference, however, between "the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question" and "the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will. . . ." *Id.* at 312, 105 S.Ct. at 1295. As such, when the infirmity underlying an initial statement transcends the mere failure to follow the dictates of *Miranda,* the determination as to the admissibility of a subsequent statement is much more involved. A careful and thorough administration of *Miranda* warnings alone is not necessarily sufficient to ensure the validity of the subsequent statement. *See id.* at 310, 105 S.Ct. at 1293–94.

This is so because the danger exists that the coercive nature of the circumstances under which the initial statement was obtained lingered in the mind of the defendant at the time he or she provided the subsequent statement, irrespective of the fact that he or she had been advised of the *Miranda* warnings and made the subsequent statement in an atmosphere devoid of coercion or compulsion. *See id.* In this instance, a court cannot determine the admissibility of the subsequent statement solely by examining the circumstances surrounding that statement. Instead, it must determine whether the subsequent statement is sufficiently removed from the milieu of the coerced statement so as to preclude any lingering taint.

There is no dispute in this case as to the fact that the appellant provided the roadside statements without having first been advised of her *Miranda* rights. The parties differ as to whether these statements were the product of improper police coercion. The appellant contends that the police officers coerced the statement by threatening to use a police dog to search the appellant for drugs and denying the appellant's requests to use the bathroom. The government discounts this notion, arguing instead that at no point was the appellant's will overborne such that she was not able to act voluntarily.

The district court examined the admissibility of the written statement as if the roadside statements had been coerced. The court concluded that "the statements made in the police station were sufficiently removed from the setting of the illegally obtained . . . inculpatory statements" at the roadside. *United States v. Marenghi,* 896 F.Supp. at 216. Notwithstanding this fact, the court never explicitly determined whether the roadside statements were indeed coerced. The district court only went as far as saying that those statements were *"possibly* coerced." *Id.* (emphasis added).

We decline the parties' invitations to label, for the first time, the circumstances surrounding the roadside statements as either coercive or noncoercive. This exercise would require us to make critical determinations as to the credibility of the individuals present at the roadside as, not surprisingly, the recitations of the events that transpired that evening vary from witness to witness. It would not be wise for us to attempt such an endeavor from a cold record.

Further, a definitive resolution of this issue is not necessary in the present case. We believe that the appellant's written statement would be admissible even if we were to conclude that the roadside statements were indeed coerced.

■ We therefore apply the heightened threshold of admissibility and begin our analysis by examining the voluntariness of the written statement independent of any potential taint that may have lingered from the roadside. The voluntariness of a statement "depends on 'whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances.'" *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir.1990) (quoting *Bryant v. Vose*, 785 F.2d at 367–68). The appellant argued below that the denial of her repeated requests to use the bathroom constituted improper influence. Indeed, she averred that she was willing to say anything at the police station to obtain permission to go to the bathroom.

The district court, having the benefit of hearing the testimony of both the appellant and Scott Pelletier, reached two conclusions on this point. First, the court found that the appellant's requests to use the bathroom were only part of "a ploy to obtain an opportunity to destroy evidence." *United States v. Marenghi*, 896 F.Supp. at 217. Second, the court determined that Scott Pelletier's refusal to permit the appellant to use the bathroom was prompted solely by his valid concerns that the appellant might dispose of any contraband concealed on her person, and did not amount to improper police conduct. *See id.*

We, much like the district court, are reluctant to excuse the absence of a female officer at the police station that evening. It was, at the very least, imprudent not to have a female officer immediately available that evening, particularly since the police knew that two females were going to be taken into custody more than ninety minutes prior to their arrival at the police station.

Notwithstanding our concern on this point, the evidence clearly supports the district court's conclusions with respect to the moti-

vations of both the officers and the appellant. The appellant has not directed our attention to any evidence suggesting that she was denied access to the bathroom in an effort to induce her to provide a statement. As such, we conclude that the district court's determination with respect to the voluntariness of the written statement was correct.

Ordinarily, we would proceed to inquire as to whether the appellant had been advised of, and waived, her constitutional rights. In this case, however, the appellant does not challenge the district court's findings with respect to her knowing and intelligent waiver of these rights.[3]

■ The sole question that remains, then, is whether the written statement could possibly have been tainted by any coercion lingering from the roadside. In order to resolve this issue, we must compare and contrast the circumstances surrounding each of the two statements. In so doing, we look to several factors: the change in the place of the interrogations; the time that passed between the statements; and the change in the identity of the interrogators. *See Oregon v. Elstad*, 470 U.S. at 310, 105 S.Ct. at 1293–94; *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1475–76 (11th Cir.), *cert. denied*, 506 U.S. 964, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992); *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir.1992), *cert. denied*, 506 U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993); *United States v. Daniel*, 932 F.2d 517, 519 (6th Cir.), *cert. denied*, 502 U.S. 890, 112 S.Ct. 252, 116 L.Ed.2d 206 (1991); *cf. Medeiros v. Shimoda*, 889 F.2d 819, 823–25 (9th Cir.1989), *cert. denied*, 496 U.S. 938, 110 S.Ct. 3219, 110 L.Ed.2d 666 (1990); *McFadden v. Garraghty*, 820 F.2d 654, 660 (4th Cir.1987).

In this case, these factors suggest that the written statement was sufficiently attenuated from any possible coercion at the roadside so as to ensure that it was not tainted. First,

---

**3.** In the district court, the appellant argued that she lacked the "cognitive abilities" to validly waive her *Miranda* rights. In her brief, she makes passing reference to these abilities. To the extent she invites this court to visit this issue, we decline. "[I]t is apodictic that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *United States v. Caraballo–Cruz*, 52 F.3d 390, 393 (1st Cir.1995) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990)).

several hours elapsed between the time the appellant made the roadside statements and the time she provided the written statement. Second, the appellant dictated the written statement in a lunch room at the police station. There is no suggestion that any of the "possibly" coercive elements from the roadside, in particular, the drug-detecting dog, were present at this location. Moreover, the appellant provided the statement *after* she had been permitted to use a bathroom. Finally, the impact of Scott Pelletier's presence at both locations is not appreciable: neither the appellant nor the record suggest that he was personally responsible for any coercive behavior at the police station.

### III. CONCLUSION

A thorough examination of the briefs and record in this case reveals nothing to support the appellant's contention that her written statement was coerced. Instead, the evidence bolsters the district court's conclusion that the appellant voluntarily provided the statement to the authorities. Accordingly, we *affirm.*